ASA F. YORK *vs.* AUGUSTUS H. CLEAVES, and another.

Cumberland.    Opinion April 9, 1903.

*Negligence.   Failure of Due Care.   Nature of Liability.*

In an action on the case to recover damages for negligence in burning the plaintiff's corn factory, the verdict was for the defendants, and two important questions of fact were presented, first, whether the fire that burned the plaintiff's buildings was communicated by sparks and brands from the defendant's sawmill, and second, if it was, were the defendants negligent in permitting the sparks to escape.

*Held;* that by the process of elimination, the evidence all points to but one conclusion, that the spark or cinder which set fire to the plaintiff's factory was communicated from the defendants' mill.

As to the second proposition, the evidence shows that the defendants' boiler, flues and smoke-stack were so constructed that they were well calculated, and liable, in a strong wind, to carry sparks and cinders for a considerable distance through the air, and that a person of ordinary care and prudence, under all the circumstances of this case, should have anticipated such a result.

On motion by plaintiff.    Motion sustained.

Action on the case to recover damages for the destruction of the plaintiff's corn factory in the town of Yarmouth by defendants'

alleged negligence in the maintenance and operation of a sawmill, from which it is claimed the sparks escaped and caused the fire. A verdict was returned for the defendants and plaintiff moved for a new trial.

The case is stated in the opinion.

*L. C. Cornish and N. L. Bassett; G. E. Bird and W. M. Bradley,* for plaintiff.

*E. Foster and O. H. Hersey,* for defendants.

SITTING: SAVAGE, STROUT, POWERS, PEABODY, SPEAR, JJ.

SPEAR, J. This is an action on the case to recover damages for negligence in burning the plaintiff's corn factory. The verdict was for the defendants. The case comes up on motion and exceptions.

Asa F. York the plaintiff was the owner of a corn factory and appurtenances connected therewith in Yarmouthville in the County of Cumberland.

The defendants owned and occupied a sawmill, operated by a boiler and steam engine. The plaintiff alleges that the smoke-stack connected with the boiler was improperly constructed, defective and out of repair; that on the 13th day of April, 1900, it was a very dry time and a high wind was blowing in the general direction of the plaintiff's buildings; that the defendants' sawmill was in such close proximity to the plaintiff's buildings that the use of fire in and about said boilers would ordinarily and necessarily threaten and endanger the buildings of the plaintiff and cause the burning thereof, of all which the said defendants well knew; that notwithstanding these conditions, the defendants on said 13th day of April, negligently built and maintained a great and hot fire in their furnaces about said boilers; that said fires, thus negligently built under said conditions, caused sparks and burning brands to escape from said smoke-stack, whereby fire and sparks and burning brands were negligently carried to the roof of the plaintiff's buildings, and caused them to take fire and to be wholly burned and destroyed.

The evidence in the case comprises nearly four hundred pages and contains the testimony of many witnesses on both sides. The testi-

mony does not disclose any direct evidence of how the fire actually occurred, as no witness saw the spark that kindled the flame. The fire was in an early stage of progress when discovered. The truth, therefore, as nearly as it can be ascertained, must be gleaned from the facts, circumstances, and conditions tending to prove or disprove the cause of the fire. These elements of proof, based upon admitted facts, all pointing in the same direction, or so connected, one with another, as to produce an effect the cause of which is inevitable, are often more reliable than positive or direct testimony which depends upon the interest, bias, opportunity, eyesight, hearing, and intelligence of the witness.

The first important question involved is, whether the fire originated from sparks or brands from the defendants' mill. The admitted facts in this case all concur, we think, in pointing to the defendants' mill as the cause of the fire which consumed the plaintiff's factory.

The defendants came from Freeport to Yarmouthville in the fall of 1899 and there erected their mill and appurtenances on the site which it occupied at the time of the fire and began to operate it in the early part of 1900. The mill was equipped with a boiler, engine, smoke-stack, and other machinery as set forth in the writ. The plaintiff's corn factory, erected in 1887-88, and operated since that time, was situated almost exactly due north of the defendants' mill and a little over 300 feet therefrom. The plan shows that the distance from the smoke-stack of the defendants' mill to the point on the roof of the plaintiff's factory, where the fire is alleged to have caught, is 340 feet, a little over 100 yards. No buildings or other obstacles intervened to break a direct and clear passage between the mill and the factory. The elevation occupied by the two buildings was such that the top of the defendants' smoke-stack was considerably higher than the roof of the plaintiff's factory.

The character of the defendants' mill was well calculated to carry sparks or brands, when the wind and the weather were such as to act in favorable conjunction with the tendency of the flues and smoke-stack to scatter fire. It appears from the testimony of the defendants that the engine and boiler, set in their mill, had been used in another mill some five or six years. The doors and grate of the fire box

were more or less broken and the draft thereby constantly increased. The flues of the boiler were straight, running directly from the fire box into the smoke-stack, giving a straight passage way for sparks and cinders direct from the fire box to the smoke-stack. The steam was exhausted directly into the smoke-stack for the very purpose of increasing the draft as the defendants themselves and other witnesses admit. The smoke-stack was about 25 feet high without any spark arrester on the top, so that if any sparks, cinders or embers passed into the smoke-stack the draft would have a tendency to at once carry them to the top of the stack and thence scatter them to a greater or less distance, depending upon the size of the sparks or brands and the velocity of the wind.

The fuel used in the fire box of the boiler, as stated by the defendant Walker, was "slabs mostly with a little hard wood." Mr. Knight who fired the boiler in the winter of 1900 says: "They were mostly green slabs but not wholly so; they used some dry wood that they had hauled there." Robert Beers who was firing at the time of the fire says: "They were burning green slabs, most all green slabs, a few dry ones. Other witnesses say "that they used slabs, pine limbs, shavings and sawdust at various times, and that they were burning slabs and dry wood all together in April." We think it can make but little difference, however, with respect to the carrying of cinders and sparks, whether the wood when it was put into the furnace was dry or green, inasmuch as it must become thoroughly dry in the furnace before complete combustion could take place; and the embers, left from the burning, whether from dry or green wood, would be practically the same in weight and density. We see no reason, even if all the slabs were green, why sparks and cinders might not with sufficient draft be drawn through the straight flues of the furnace and carried up and out of the smoke-stack, as in fact the testimony shows was done.

Mr. Knight, the fireman, when asked in regard to this matter testified "that he knew of sparks and brands coming out of the stack; that he noticed them in the evening, the latter part of the day's work." He testified to the same on cross-examination. Mr. Knight worked at the mill during the months of December and January. Mr. Blake

another workman at the mill, in the month of January, corroborated Mr. Knight. Mr. Lawrence, who was often at the mill during the whole time of its operation, also said that he saw "sparks and brands coming out of the smoke-stack." In answer to the question as to how often he had noticed them, he said "well, quite frequently when I used to be down there; it would depend on the way of the wind. If the wind was a south wind, it was right in my track going and coming, but if it was a west wind, it would blow them off where I didn't take much notice of them." Thus it appears from the uncontradicted evidence that sparks and brands during the whole period of the operation of this mill were observed by several witnesses to be coming from the top of this smoke-stack. There seems but little question that a wind strong enough and blowing in the right direction would carry sparks and cinders from the smoke-stack of the defendants' mill a distance a little more than 100 yards to the plaintiff's factory; and if the conditions were right, communicate fire.

The evidence all shows that April 30th when this factory was burned was an unusually dry time for this season of the year. The fact that some twenty other fires were started from the cinders and brands, carried from the burning factory, is sufficient to show that the roofs of the houses were very dry and easily set on fire. We think that, on the day of this fire, the evidence convincingly shows that a heavy wind was blowing from the south directly from the defendant's smoke-stack towards the plaintiff's roof. The strength of the wind on the afternoon of the fire is characterized by various witnesses, as follows: "Almost a gale; heavy wind; blew very hard; very strong; pretty strong wind; quite strong wind. Perhaps 20 miles an hour; good strong wind; very strong; unusally strong." The weather bureau gives the velocity on the day of the fire, as follows: "12 o'clock 10 miles an hour; 1 o'clock 12 miles an hour; 2 o'clock 16 miles an hour; 3 o'clock 17 miles; 4 o'clock 16 miles. The greatest velocity between 1 and 6 o'clock 23 miles per hour." Mr. Jones of the weather bureau thinks this was about 3 o'clock. There was no material controversy as to the strength of the wind. The evidence clearly demonstrates that it was of sufficient force to create

a heavy draft in the smoke-stack and to carry sparks and cinders a considerable distance.

But with reference to the direction of the wind, as already observed, there was a claimed difference.   While the defendants appear to contradict the contention of the plaintiff upon this point, yet we think their own witnesses practically substantiate it, and all the evidence in the case, taken into consideration, overwhelmingly sustains it.   Various witnesses testified as to the direction of the wind as follows : Merrill, from the south; plaintiff, from the south, a little west of south; Horn, south-west, southerly; Sawyer, south or nearly so; York, about south; Ring, nearly south; McKennon, from the south, a little to the westward; Gay, was shifting a little; Humphrey, south ; Beeman, about south; nearly parallel with the Grand Trunk Railway; blew right up the track.   It should be here observed that the railroad track is nearly parallel with a straight line drawn from the defendant's saw mill to the plaintiff's factory.

The defendants' witnesses testified as to the direction of the wind, as follows:   Gero, a hoseman of the fire department, says, speaking of the smoke of the fire, it went in a northerly direction; and also that it trended from the depot in a northerly direction; also that it was changeable; Jenness, southerly—about; McKenney, it was very near a south wind; Leighton, the wind was a little west or south and then varied, shifted about.   With reference to the lines upon the plan, representing the railroad track, he testified, that the wind was nearly parallel with the lines, it wasn't quite parallel; it was a little west from parallel.

The record of the weather bureau also shows that on the morning of April 30, at 8 o'clock the wind was from the west; at 10 o'clock it was from the west; at 11 o'clock from the south-west; at 12 o'clock set south and so continued until 4 in the afternoon when it worked back again towards the south-west.   It was testified to by the keeper of the bureau that the wind this afternoon backed from the west towards the south and then veered again towards the west during the evening.   The witness said, "we consider the wind as backing when it moves from the south point around by the west point towards

the north, and veering when it moves from the north point around by the west point towards the south."

There is no substantial difference between the witnesses of the plaintiff and those for the defendant with respect to the direction of the wind. They vary somewhat as to the exact course, but the conclusion of the whole is that on the afternoon of the fire the wind was substantially blowing from the south, shifting a little from east to west, practically parallel with the railroad tracks. We think there can be but little doubt that the course of the wind was such during this afternoon as to carry sparks and cinders directly towards the plaintiff's factory. The spark or cinder that caused the fire must have come from the south.

The defendants, however, contends that the spark which burned the plaintiff's buildings might have been communicated from fires along and near the railroad track, or from a passing train. Of course it is not incumbent upon the defendants to show how the fire did occur, but as they contend that it might have taken from one of these sources, it is proper here to determine what weight, from the evidence in the case, should be given to the contention. The conclusion already arrived at with respect to the direction of the wind settles this point. The railroad is situated nearly due east of the corn factory and about 144 feet distant therefrom. The evidence shows that the wind during the whole afternoon would carry sparks from a fire along the railroad, or cinders from a locomotive, in an opposite direction from the railroad to the corn factory.

The wind backed from the north through the west to the south and, during all the time until it reached the south, would carry fire to the eastward of the railroad. When it reached the south it would carry sparks up the railroad in a line parallel with the plaintiff's factory. As the wind was at no time in a quarter calculated to carry sparks towards the plaintiff's buildings, the fire therefore could not have been communicated from the direction of the railroad track. Hence, it becomes immaterial to consider the character of the fires along the railroad or whether a train passed along, as contended by one of the defendants' witnesses. It is further contended that the fire might have originated from within the building itself, as several men were

occupying a portion of the building engaged in some kind of labor; and to substantiate this theory, some of the defendants' witnesses said that they saw, or thought they saw the fire break through the roof.

Joseph McKearney states that he first saw the fire about midway between the ridgepole and the ventilator and that when he discovered it, it was from a yard and a half to two yards square. Alvin Goff says that he first discovered the fire in the cupola and that it seemed to be coming out all around it. He didn't notice the shingles on fire. John W. Kenney says that he first saw the fire on the roof about halfway between the ridgepole and the ventilator. Mr. Cleaves in direct contradiction of his own witness Alvin Goff and also of Mr. Walker, says that he, at the time he saw the ventilator afire, also saw a blaze on the roof five or six feet across it. Mr. Kenney, who notified Mr. Walker of the fire and who must have looked directly at it with Mr. Walker, saw the fire on the roof, while Mr. Walker saw the ventilator and only the ventilator all afire. We have no doubt that each of the above witnesses, as well as the defendants themselves, testified to the location of the fire exactly as they saw it, but the contradictory views expressed by them demonstrates that such testimony is of little or no value in fixing the origin of the fire on the roof.

This leaves for consideration upon this point only the testimony of the witnesses who were within the building. The evidence shows that there had been no fire in the furnace of the boiler at the factory since the previous fall and that all the workmen, at the time the fire caught, were, at that moment, at work about the only fire inside the building, contained in a fire box about 15 inches in diameter and 18 inches high, in which soft coal was burned and on top of which was a place for melting solder. There was no other fire of any kind in the building, neither could it have occurred from smoking by the men, as at the time of the fire, they were all at work in the westerly end of the building, while the fire first appeared on the roof of the easterly end. Without analyzing the testimony further, it clearly appears that the fire did not originate from within the building. The conclusion, therefore, seems irresistible that the spark or cinder, which

set fire to the plaintiff's factory, was communicated from the defendants' mill.

This brings us to the consideration of the second proposition in the case, the defendants' negligence; for, if it is conceded that the fire was caused by sparks from the defendants' smoke-stack, the plaintiff must go still further and show that it was by reason of some neglect either in the appliances, or in the care and management of the fire by the defendants. The defendants were not insurers, but they were bound to exercise ordinary care and precaution in the control and management of their fire to prevent the destruction of their neighbor's property. Did the defendants, under the circumstances disclosed in this case, exercise such care and prudence in the construction and equipment of their boiler and smoke-stack, and in the control and management of the fire in the furnace, on the afternoon of April 30, as ordinarily careful, prudent men would have done under like circumstances? We think they did not.

The fire box was directly in front of the flues. The flues were straight and horizontal, connecting directly with the smoke-stack. The smoke-stack had an increased draft through the agency of the exhaust pipe, had no spark arrester and presented an opening at the top to the full area of the mouth of the stack. A heavy wind was liable to blow at any time, as it was actually blowing on the afternoon of the fire. A furnace, flues and smoke-stack constructed like this one were liable in a strong wind to carry sparks and cinders for a considerable distance through the air, and we think that a man of ordinary care and prudence, under all the circumstances in this case, should have anticipated such a result.

Upon both propositions in the case, the evidence is so overwhelmingly in favor of the plaintiff's contention that the court is of the opinion that the jury must have been influenced, in their verdict, by some misunderstanding, bias or prejudice. This conclusion on the motion renders it unnecessary to consider the exceptions.

*Motion sustained. New trial granted.*